The FRANCESCO PARISI FWDG.
CORP., Plaintiff,

v.

UNITED STATES, Defendant.

C.D. 3730; Protest No. 64/23722.

United States Customs Court,
Second Division.

March 4, 1969.

Allerton deC. Tompkins, New York City, for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Morris Braverman, New York City, trial attorney), for defendant.

Before RAO and FORD, Judges.

RAO, Chief Judge:

This protest places in issue the tariff status of an article invoiced as a "Nistri Stereocomparator." This article was classified as a surveying instrument, pursuant to paragraph 360 of the Tariff Act of 1930, as modified by the Supplementary Trade Agreement with Switzerland, 90 Treas.Dec. 174, T.D. 53832, and assessed with duty at the rate of 35 per centum ad valorem. Plaintiff claims, alternatively, that it is classifiable either as laboratory apparatus in chief value of metal, pursuant to paragraph 360 of said Tariff Act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, and subject to duty at the rate of 25½ per centum ad valorem, or as an article having as an essential feature an electrical device or element, pursuant to paragraph 353 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, which is du-

tiable at the rate of 13¾ per centum ad valorem.

The relevant statutory provisions are as follows:

Paragraph 360 of the Tariff Act of 1930, as modified by said Supplementary Trade Agreement with Switzerland:

Surveying instruments and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for. ...................... 35% ad val.

Paragraph 360 of the Tariff Act of 1930, as modified by said Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade:

Scientific and laboratory instruments, apparatus, utensils, appliances (including mathematical instruments but not including surveying instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for:

\*   \*   \*   \*   \*   \*   \*   \*

Other (except \* \* \*) ....................25½% ad val.

Paragraph 353 of the Tariff Act of 1930, modified by said Torquay Protocol to the General Agreement on Tariffs and Trade:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*   \*   \*   \*   \*   \*   \*   \*

Other (except \* \* \*) ......................13¾% ad val.

———◆———

Mr. Seymour Friedman testified on behalf of the plaintiff and stated that he was executive vice president of the O.M.I. Corporation of American, the real party in interest herein. Mr. Friedman holds a degree of Bachelor of Science in chemical engineering from George Washington University and, prior to his association with O.M.I., worked as a civilian for the U. S. Corp. of Engineers as Chief of Research Photogrammetry for the Engineer Research and Development Laboratories in Fort Belvoir, Virginia. Mr. Friedman stated that he participated in the design of the instant articles after urging Ottico Meccanica Italiana of Italy to produce them. He is personally familiar with every one of the approximately 18 stereocomparators which have been sold by O.M.I. in the United States, including the one at issue which went to Ohio State University. He supervises the installation, visits the locations, demonstrates the operation, trains the operating personnel all with a view toward the particular uses to which the purchaser will put the stereocomparator.

A photograph of the Nistri Stereocomparator was introduced in evidence as plaintiff's exhibit 1. The witness then proceeded to describe its physical characteristics which we will first summarize briefly without functional explanations. The stereocomparator weighs slightly over 4,000 pounds and is rough-

ly 6 feet long, 3 feet deep and 4 feet high. It possesses three stages on which flat and preferably translucent objects are placed. Any two of the three stages are visible at one time through built-in binoculars and the position of the stages may be varied by means of hand wheels. A panel on the instrument is designed to show illuminated numbers and a small camera photographs whatever is being viewed at the moment, for record keeping purposes. In basic terms the stereocomparator is used to give a mathematical expression to the location of various points on a flat surface as they relate to a selected central point. The mathematical system used for this purpose is known as the Cartesian coordinate system which is the method of expressing the location of a point in terms of its position relative to two perpendicular lines commonly known as the X and Y axes. Any point may be described by the spot at which lines drawn from it, which are perpendicular to the X and Y axes, intersect those axes. The X axis, which usually runs horizontally, and the Y axis, which usually runs vertically, meet at point O and continue through that point into negative values.

According to the witness this raw data extracted by the stereocomparator provides the basis for trigonometric computations which reveal the three-dimensional characteristics of objects depicted in a two-dimensional manner. As an example of the techniques discussed above the witness recounted the use of the stereocomparator in the determination of the actual three-dimensional path taken by a nuclear particle. In a bubble chamber the movements of nuclear particles initiate the growth of a string of bubbles in their path. Three simultaneous photographs are taken of the same nuclear occurrence. (We presume that in keeping with related testimony, they are taken from three different positions.) The particle's path is usually revealed as a light line on a black area. The three photographs are then placed on the three stages of the stereocom-

parator. By using certain reference marks on the photographs themselves the exact geometric center of each of the photographs is found and by pushing a button is registered as point O of the above-mentioned Cartesian coordinate system. The operator then, observing a particular photograph through the binocular portion, follows the line of the nuclear track by manipulating hand wheels which move the stage on the X or Y axis. The screws which control the movement of the stages are, under ideal conditions, accurate to about four millionths of an inch to permit extraordinarily precise adjustments of the stage. At selected points on the track readings are taken and appear as illuminated numbers on the stereocomparator's panel. The stereocomparator does not process these figures further. They are transferred to an accessory typewriter or a paper tape punch and thence to a digital computer, which undertakes the computations which reveal the exact path in space taken by the nuclear particle.

The witness stated that the stereocomparator is designed to measure only flat surface materials and the data it provides from photographs is useful only if certain facts about the photograph are known. The witness gave the example of a photograph of an automobile door which, absent a familiar reference point or object, would not reveal whether it was a toy car or an actual car.

The witness testified to a number of uses of the stereocomparator with which he was familiar: astronomical measurements, the determination of ballistic trajectories, the study of vehicular traffic, the determination of the relationship of an island to the continental land mass, the measurement for accuracy of certain etched grid glass and precision rulers, the study of nuclear particles and certain military intelligence analyses which he was not at liberty to disclose but which he stated did not comprise ground survey problems. He did mention however that the installation of guided missiles in Cuba was determined through the use of stereocomparators.

The witness testified that stereocomparators made by two competing European companies could be used for the same purposes.

According to the witness the stereocomparator must be used in what he termed "laboratory conditions" in order to be useful. This entails precise control of temperature, humidity and air pressure. He knows of no instances in which it was used in the field or any place other than a laboratory. Aside from the instant importation for the use of Ohio State University stereocomparators have been sold to the National Research Council of Canada, the Fort Belvoir Research and Development Laboratories, the Rome Air Development Command Research Laboratories, Navy Research Laboratories and the Central Intelligence Agency.

On cross examination the witness testified that the stereocomparator was also used in photogrammetric surveying.

The testimony related to this matter is as follows:

Q. Mr. Friedman, have you ever heard of photogrammetric surveying? —A. Yes, sir.

Q. Will you describe to the Court what that is?—A. Photogrammetric surveying is a term applied to measuring the land surface by means of photographs. You photograph the area that you are interested in measuring and bring these photographs back to a laboratory and, with special machines you can draw maps, contour maps, roads, buildings—in other words, publish, or, rather, draw and design and ultimately publish a topographic map. It is necessary to occupy the terrain, to survey points in the field, before this process can be completed— so, actually, it is a combination of photography and ground survey.

\* \* \* \* \* \*

Q. The Nistri Stereocomparator, is it used in photogrammetric surveying? —A. It can be used, and is used on occasion; yes, sir.

Q. Does the Nistri Stereocomparator measure distances?—A. It measures distances on photographs.

Q. Does it determine horizontal lines?—A. It measures horizontal lines on photographs.

Q. Does it measure angles?—A. No, it does not measure angles.

Q. Is it used in aerial triangulation?—A. Yes, it is used in aerial triangulation.

Q. Exactly what does that mean?— A. Aerial triangulation is a means of determining positions on the earth's surface by flying over it with aerial— by taking aerial photographs, and having field men go out with surveying instruments, and determining positions that have been photographed.

Subsequently, the photographs are brought back to a laboratory, measurements are made, and these measurements are mathematically treated in conjunction with the ground survey data. The net result is additional data which had not been occupied in the field, which can be identified.

Q. And, then, are maps made sometimes from these photographs?—A. That is another process. That is photogrammetric surveying, which I described before.

Q. But that is done and has been done with the Nistri Stereocomparator?—A. No. You cannot make maps with the Nistri Stereocomparator.

Q. With the material that you obtain from the Nistri Stereocomparator?—A. No, sir. You have to process it mathematically, and the data which has been processed mathematically is then used in other equipment to make maps.

■■ It is readily apparent that the provision under which the stereocomparator was classified is a use provision and the law is well settled that where use is the criterion for gauging the scope of a tariff provision what is ordinarily contemplated is chief use. *United States v. James P. Heffernan Paper Co.,* 17 CCPA 61, T.D. 43358. Thus, implicit in

the collector's classification of the importation as a surveying instrument is the presumption that it was chiefly used for surveying. United States v. Marshall Field & Co., 17 CCPA 1, T.D. 43309, Dorward & Sons Co. et al. v. United States, 40 CCPA 159, C.A.D. 512. Plaintiff assumes the burden of negating that finding.

■ To that end plaintiff introduced testimony tending to show that the stereocomparator is utilized in a number of applications which are clearly not connected with surveying. Among these are the charting of the paths of atomic particles and ballistic trajectories and various accuracy measurements. The testimony of plaintiff's witness also tended to emphasize the abstract or neutral aspects of the importation's use in portraying it simply as an instrument for the ascertainment of raw mathematical data. None of this testimony however is potent enough to negate the presumption that the chief use of the stereocomparator is as a surveying instrument. It is not enough merely to enumerate a variety of uses to which an importation is put without specifying with particularity the extent to which such uses are substantial. United States v. Kaufman & Co., 14 Ct.Cust.Appls. 264, T.D. 41881, United States v. Gardel Industries, 33 CCPA 118, C.A.D. 325. There is nothing in the record to indicate that the uses to which plaintiff's witness testified are not tentative, exploratory or fugitive. There is nothing to counteract the presumed predominance of the importation's use in the practice of photogrammetric surveying.

There is no question that the science of surveying includes that variety known as photogrammetric surveying. In its discussion of surveying, Van Nostrand's Scientific Encyclopedia, Third Edition, refers to photogrammetric surveying as " * * * a term applied to the use of photographs of the earth's surface in connection with the preparation of maps." The same encyclopedia's discussion of "photogrammetry" also includes descrip-

tions of instruments similar to the stereocomparator.

It was incumbent upon plaintiff to either show that the use of the stereocomparator in photogrammetric surveying was not the dominant use or that one or a number of the other uses predominated. Plaintiff took neither of these alternatives and instead chose only to introduce an enumeration and explanation of nonsurveying uses. This is not directly relevant to the issue of chief use.

Plaintiff's witness also testified at length regarding the places in which the stereocomparator is used and the conditions under which it is used. It appears that the stereocomparator is used only in laboratories and will function properly only if the temperature, humidity and air pressure in the room are closely controlled. However, even if the stereocomparator in its use and location meets the criteria established for laboratory instruments, it would nevertheless be more properly classifiable as a surveying instrument. It presents no logical contradiction for a surveying instrument to be used in a laboratory under laboratory conditions. This alone would not make it a laboratory instrument. When we must choose between the rates of duty provided for in the modifications of paragraph 360 we choose the more specific designation of surveying instruments found in the Supplementary Trade Agreement with Switzerland, *supra,* rather than the catch-all provision for other laboratory instruments in the sixth protocol, *supra.*

■■ Heretofore the devices which have been held to be surveying instruments or parts thereof happened to have all been articles used in the field in direct observation of the physical attributes or measurements of locations on land or sea. This was the case with sextants in Davies, Turner & Co. et al. v. United States, 40 Treas.Dec. 177, T.D. 38877, deviation recorders in R. W. Smith v. United States, 41 Cust.Ct. 78, C.D. 2024, and poteclinometer cartridges in Schlumberger Well Surveying Corp. v. United States, 54 CCPA 37, C.A.D. 901. However, we have found nothing in the

interpretations of the statutory term "surveying instrument" to indicate that the term is limited to articles used in the field or articles which perform a specific type of mathematical function. Instead we note a continuing flexibility of approach in the treatment of surveying instruments. See Schlumberger Well Surveying Corp. v. United States, *supra*. An instrument such as the stereocomparator which, in the absence of more detailed evidence, we have found to be chiefly used in the practice of photogrammetric surveying and aerial triangulation has a sufficient involvement in the process of surveying to support its classification as a surveying instrument.

Accordingly we overrule the protest herein and find that the stereocomparator is properly dutiable at the rate of 35 per centum ad valorem as a surveying instrument pursuant to the provisions of paragraph 360 of the Tariff Act of 1930, as modified by the Supplementary Trade Agreement with Switzerland, *supra*.

Judgment will be entered accordingly.